# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

JIM HOWE, D/B/A BIG JIM'S BONDING,   )
   )
      Plaintiff,   )
   )
   v.   )   No. 2:19-cv-00067
   )
RONNY HOWELL, ELIZABETH WILLIAMS, )
CUMBERLAND COUNTY, TENNESSEE,   )
CASEY COX, JASON ELMORE, JON   )
WIREY, and JEFF SLAYTON,   )
   )
      Defendants.   )

## MEMORANDUM OPINION

This civil action arose from the execution of a search warrant at Big Jim's Bonding in Crossville, Tennessee on August 29, 2018. Jim Howe, d/b/a Big Jim's Bonding, brings three federal and five state law claims against two sets of Defendants. Both have filed motions for summary judgment: (1) a Motion for Summary Judgment (Doc. No. 76) filed on behalf Special Agents Ronny Howell of the Tennessee Department of Revenue ("TDOR") and Elizabeth Williams of the Tennessee Bureau of Investigations ("TBI") (the "state Defendants"); and (2) a Motion for Summary Judgment (Doc. No. 72) filed on behalf of Cumberland County, its Sheriff Casey Cox, and Investigators Jason Elmore, Jon Wirey and Jeff Slayton (the "county Defendants"). Also pending before the Court are Plaintiff's "First Motion for Set Aside of Agreed Protective Order" (Doc. No. 103) and his Motion for Leave to File Sur-Response (Doc. No. 106).

For the reasons that follow, Defendants' Motions for Summary Judgment will be granted, Plaintiff Motion to Set Aside will be denied, and Plaintiff's Motion for Leave to File Sur-Response will be denied as moot. (Doc. No. 106).

# I. **FACTUAL BACKGROUND**[1]

Plaintiff is married to Amanda Howe. At some point, she told her friend, Lisa Luttrell, that Plaintiff had allegedly traded sexual favors for bonds, and "possibly raped a girl." (Doc. No. 87, SOF ¶ 4). Mrs. Howe told Luttrell that she was afraid of her husband and had consulted with several lawyers about obtaining a divorce. She also said that, should her husband be charged with a crime, he would "lie his way out" and intimidate witnesses. (Id. ¶ 5).

On April 25, 2018, Mrs. Howe met with Luttrell, ADA Worley, and Inv. Slayton, and confirmed the allegations. She also provided further information, along with the names of individuals with knowledge. Ms. Howe's information prompted an investigation into whether Jim Howe was trading sex, drugs, or stolen goods for bonds. (Id. ¶ 7).

ADA Worley and Inv. Slayton began interviewing some of the individuals Mrs. Howe had named. Invs. Elmore and Wirey were present for some of those interviews. After interviewees began confirming that Plaintiff had traded sex for bonds, ADA Worley referred the matter to the TBI for investigation.

SA Williams was assigned the case. She understood that, while there were some allegations of kidnaping and rape, the primary allegation was the exchange of sexual favors for bonds. SA Williams conducted further interviews, sometimes with the assistance of Inv. Slayton and/or Inv. Elmore. This included interviewing Plaintiff, and some of the individuals who had business with his bail bonding company.

Multiple women "recounted situations of sexually predatory acts by Plaintiff." (Id. ¶ 12).

---

[1]The following factual allegations are drawn from the numerous statement of facts and responses thereto submitted by the parties, (Doc. Nos. 74, 78, 87, 88, 91, 98, 102), along with the search warrant and underlying affidavit (Doc. Nos. 1-1, 1-2). Unless otherwise noted, the stated factual allegation is undisputed.

2

Plaintiff vigorously disputes these allegations, and claims that at least one of the individuals who had been interviewed later recanted her statements. However, he does not know whether this alleged recantation occurred before or after the execution of the search warrant at issue in this case. (Id. ¶ 13).

While all of this was going on, TDOR was "concurrently" investigating Plaintiff regarding the failure to pay his business's quarterly tax bonds. According to Plaintiff, he got behind on his taxes due to illness and arranged with Mark Sells of the TDOR for an extension of time within which to pay his first quarter taxes for 2018. Plaintiff also claims that he reached an agreement with Sells to pay his second quarter taxes by the end of August 2018. (Id. ¶¶ 15, 16).

Also during this same general time-frame, the TDOR was investigating Plaintiff for "the alleged willful attempt to evade bail bond tax due the state of Tennessee during the period January 2017 through March 2018." (Doc. No. 94-1 at 3). This investigation arose after District Attorney General Bryant Hathaway of the 13th Judicial District[2] asked TDOR to review Big Jim's Bonding taxes because he had been informed that Plaintiff "was receiving inappropriate favors in exchange for the issuance of bail bonds in Cumberland and Putnam counties." (Id.). On July 25, 2018, Brian L. McGhee, a TDOR Special Agent issued a report recommending that the investigation be closed because, during the relevant period, Big Jim's Bonding had reported more bonds than were issued and remitted more in bail bond taxes.[3]

On the day the warrant was issued, SA Ronnie Howell first learned of TDOR's investigation

_____

[2] The district consists of seven counties, including Cumberland and Putnam.

[3] In his report, SA McGhee explained that, where multiple bail bonds are issued for a particular defendant during a thirty day period, only one bail bond and one tax needs to be submitted that covers the aggregate bail for all charges.

3

into Big Jim's Bonds. SA Howell was contacted because the assigned case agent was involved in serving a warrant on a different business, and Howell was the nearest available agent. Howell drove from Chattanooga to Crossville where he met with ADA Worley and another ADA who were tasked with drafting the search warrant affidavit. In drafting the warrant, the ADAs spoke with TDOR staff attorney Will Binkley, Seth Stinson, a TDOR employee based in Nashville, SA Williams, and Inv. Elmore. There was also a several hour roundtable discussion among those in attendance.

The search warrant affidavit, signed by SA Howell, alleged violations of Tenn. Code Ann. §§ 67-1-1440(d), 67-4-803, and 67-4-806. The first statute makes it a Class E felony for any person to "delay, hamper, hinder, impede, obstruct, or thwart the state of Tennessee in the collection of any of its revenue"; the second requires that a tax of $12.00 be collected for each bail bond issued; and the third makes it the "the duty of the bail bondsman to collect the tax imposed[.]" The affidavit claimed that Plaintiff was not collecting the $12.00 tax from some of his clients. Rather, and relaying what others involved in the investigation had told him, SA Howell stated that: (1) Christian Bilbrey claimed that, after being arrested for possession of drug paraphernalia, Plaintiff suggested she have sexual intercourse with him in exchange for the bond, and that she gave Plaintiff 90 Roxicodone tablets and an 8-ball of methamphetamine as payment for the bond; and (2) Britney Russell said that sometime around Christmas 2015 she was arrested, and she performed oral sex on Plaintiff in exchange for the bond. (Doc. No. 1-2 at 7). SA Howell also averred that a review of state records showed that Big Jim's Bonding failed to pay timely the bonding tax for the third and fourth quarters of 2017 and the first quarter 2018. Further, while payment for those bonds was made on June 18, 2018, the payment did not include applicable interest or penalties, and the bond for the second quarter of 2018 was still outstanding. (Id.).

4

SA Howell's affidavit was presented to Cumberland County Judicial Commissioner Lou Blevins on August 29, 2018, who issued a search warrant for the office of Big Jim's Bonding. The warrant provided that "the evidence to be searched for" includes:

> a bit-by-bit image of the business' computer hard drive, any electronic storage media including but not limited to diskettes, jump drives, tapes, CDs, DVDs, PDAs, etc. and/or records in any form that may document the number of bonds written, the amount of bail bond tax collected by the business, bail bond tax receipts, bail bond logs, bail bond contracts, bail bond reports, bail bond tax returns, federal tax returns, business tax returns, information provided to the business' accountant related to bail bond tax, information provided to the business' insurance companies regarding bail bonds, bank statements, check ledgers, check records, other records kept in due course of business for Big Jim's Bonding. Also any vehicles, out buildings, and storage facilities owned, leased or used by Big Jim's Bonding or James (Jim) Alexander Howe located at 59 South Main Street, Suite 101 Crossville, Cumberland County, Tennessee.

(Doc. No. 1-1 at 2). The warrant was executed the same day it was issued by SAs Howell and Williams, and Invs. Slayton, Elmore, and Wirey.

At the time of execution of the warrant, Plaintiff was not on the premises, but was summoned there by a Big Jim's employee. Ivy Gardner, Plaintiff's lawyer, also arrived on scene. Both saw the search warrant. (Doc. No. 90, SOF ¶¶ 9-10).

Two employees of Big Jim's Bonding were interviewed as the search was being conducted. Plaintiff provided his cellphone and passcode, and opened the business safe upon the demand of authorities. Plaintiff and his lawyer were asked to leave the building during the search and, according to Plaintiff, when Gardner objected, they were threatened with arrest by Inv. Slayton (Doc. No. 87, SOF ¶ 38). Both remained outside for the duration of the search. (Doc. No. 90, SOF ¶ 12).

Evidence seized during the search was transported to the Cumberland County Sheriff's Department. Plaintiff claims that, among the items seized was almost $8,000 in cash surety money,

the second quarter bail bond tax return, various files, and cell phones. Laptops on the premises were not seized, nor were firearms that were discovered during the search. (Id. ¶¶ 42, 43). No county Defendants created a log of the items seized – they claim it was not their warrant and hence not their responsibility – but SA Howell completed a handwritten log that Plaintiff characterizes as "inadequate." (Id. ¶ 44).

At some point, perhaps weeks later, SAs McGhee and Williams, Invs. Slayton, Wirey, and Elmore, and ADAs Worley, and Hatch examined the documents at the Sheriff's office, but found no cash in the files. After the review, SA McGhee took the evidence with him, but later returned it to the Cumberland County Sheriff's office where it was retrieved by Plaintiff approximately two months after the initial seizure. (Id. ¶¶ 45-49). Plaintiff claims that, not only was $7,970 in cash missing, but also "evidence bags 3, 5, 7, 8, 11, 17, and 18." (Id. ¶ 49).

Plaintiff alleges that after the search, he lost business because Cumberland County Sheriff's Department changed the phone number listing for Big Jim's Bonding in the directory at the Cumberland County Jail to the phone number of one of Plaintiff's competitors, but he has no evidence to show which, if any, deputy altered the number. (Id. ¶ 57). When Plaintiff complained to Captain Tim Claflin, the Cumberland County Jail Administrator, that his number was incorrectly listed, Capt. Claflin investigated and determined that, in one of the pods, an inmate had created a handwritten list of bail bondsman companies and placed it near the phone and phone book in the day room of the pod. (Id. ¶ 61). Capt. Claflin removed that list, and a typed list of bail bonding business number was placed in each pod of the jail. (Id. ¶ 62). Moreover, all bonding business in the county are requested to provide magnetic 8" x 10" signs that are placed on the door in the intake area so that the phone numbers are available to inmates. To ensure fairness, those signs are rotated every month

6

so that the same bail bond business is not always on top.  (Id. ¶¶ 58, 59).

As indicated at the outset, Plaintiff brings three federal and five state law claims against Defendants.  However, after the Motions for Summary Judgment were filed, the parties stipulated to dismissal of all of Plaintiff's state law claims, with the exception of Tenn. Code Ann. § 8-8-302, which permits suits against counties for actions of deputies acting "by virtue of or under color of law."

## II.  MOTIONS FOR SUMMARY JUDGMENT

The standards governing summary judgment are well-established and, as evidenced by the briefing that has been submitted, understood by the parties.  Therefore, it simply suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

## A.  Federal Claims

Plaintiff's federal claims are brought under 42 U.S.C. § 1983, which provides a cause of action against any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]"  Thus, to establish his claims, Plaintiff "must show that (1) a person

acting under color of law (2) deprived him of his rights secured by the United States Constitution or its laws." Neuens v. City of Columbus, 303 F.3d 667, 670 (6th Cir. 2002) (citing O'Brien v. City of Grand Rapids, 23 F.3d 990, 995 (6th Cir.1994)).  Here, there is no doubt that Defendants were acting under state law, so the only question is whether Plaintiff was deprived of a constitutional right and/or whether Defendants are entitled to qualified immunity, which "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011).

### 1. Fourth Amendment

The Fourth Amendment, made applicable to the states through the Fourteenth Amendment, protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  The "'basic purpose of this Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials.'"  Carpenter v. United States, 138 S. Ct. 2206, 2213 (2018) (quoting Camara v. Mun. Ct. of City and City of San Francisco, 387 U.S. 523, 528 (1967)).

Plaintiff claims a twofold violation of the Fourth Amendment: the search warrant was overbroad and otherwise invalid; and the search warrant was executed in an unreasonable manner. In response, Defendants argue that there was no constitutional violation in securing and executing the search warrant and that, even if there was, no clearly established law prohibited their conduct, meaning they are entitled to qualified immunity.

In response to the state Defendants' qualified immunity argument, Plaintiff discusses the general law governing that immunity, and argues: (1) "[t]he warrant's invalidity based on overbreadth and lack of particularity are obvious based upon binding precedent"; and (2) "[a]

8

reasonable person would have known that executing an invalid search warrant on an individual's place of business carried with it the unnecessary risk of violating that individual's clearly established constitutional rights, especially when said execution involved the seizure of such a broad array of documents, records and other property."  (Doc. No. 89 at 28).  Similarly, in response to the county Defendants' assertion of qualified immunity, Plaintiff argues that "[t]he warrant's invalidity based on overbreadth and lack of particularity are obvious based upon binding precedent above-cited," and that "[n]o reasonable officer would believe that it was reasonable to search and seize computers and phones in the broadest possible manner based upon a narrow bail bond tax offense."  (Doc. No. 86 at 20).

Plaintiff's reference to "binding precedent above-cited" is unhelpful.  When the defense of qualified immunity is asserted, "plaintiff has the burden of showing that a right is clearly established." Everson v. Leis, 556 F.3d 484, 494 (6th Cir. 2009). "'For a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holzemer v. City of Memphis, 621 F.3d 512, 527 (6th Cir. 2010) (quoting, Leonard v. Robinson, 477 F.3d 347, 355 (6th Cir. 2007)). " 'A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point.'" Id. (quoting Risbridger v. Connelly, 275 F.3d 565, 569 (6th Cir. 2002)).

Thus, for example, Plaintiff's reliance on State v. Kelsey, 592 S.W.2d 509 (Mo. App. 1979) for the proposition that "[w]here an officer obtains a 'warrant to search for evidence of one crime when he is really interested only in seizing evidence relating to another crime, for which he does not have a warrant, his search is 'pretextual' and the fruits of that search should be suppressed" is

9

misplaced because that was a Missouri Court of Appeals case and undoubtedly unknown to officers in the Middle District of Tennessee. Horton v. California, 496 U.S. 128 (1990) on which Plaintiff also relies is binding precedent, but the language he quotes (id. at 147-48) comes from the dissenting opinion. Besides, that language dealt with "pretextual searches," which the dissenters conceded was not before the court, making it dissenting *dicta* at best.

The Sixth Circuit's decision in United States v. Hodson, 54 F.3d 286, 292 (6th Cir. 2008) is more on point, but it is not as Plaintiff claims, "a similar case[.]" (Doc. No. 86 at 5). There, the court found that the issuance of a warrant was improper "because the crime alleged (child molestation) bore little or no connection to the search request (computers for evidence of child pornography)." Id. at 288-89. In fact, the affidavit in support of the search warrant "d[id] not establish, allege, or even suggest any basis for a finding of probable cause to believe that [defendant] had ever been involved in child pornography in any manner," nor was there any "assertion . . . of any relational nexus between child molestation and child pornography." Id. at 289. In short, Hodson "involved a disconnect between the probable cause provided in the affidavit and the items to be searched." United States v. Kinison, 710 F.3d 678, 687 (6th Cir. 2013).

Here, the relationship between an investigation of "sex for bonds" (as Plaintiff characterizes it) and an investigation into Big Jim's alleged failure to pay bond taxes may be somewhat attenuated, but there is not the same sort of disconnect between probable cause and the search warrant as in Hodson. The search warrant alleged a violation of Tenn. Code Ann. § 67-1-1449, asserted that Big Jim' Bonding had not paid the bond tax for the second quarter of 2018, and suggested that Plaintiff may have attempted "to delay, hamper, hinder, impede, obstruct or thwart" the collection of taxes by exchanging bond (and the tax on those bond) for personal favors, instead of money.

10

A police officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018) (citation omitted). "Notice to officials is paramount; 'the salient question' in evaluating the clearly established prong is whether officials had 'fair warning' that their conduct was unconstitutional." Guertin v. State, 912 F.3d 907, 932 (6th Cir. 2019) (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002). Although plaintiff need not cite a case that is "on all fours in order to form the basis for the clearly established right," he or she "must generally identify a case with a fact pattern similar enough to have given 'fair and clear warning to officers' about what the law requires." Id. (quoting White v. Pauly, 137 S.Ct. 548, 552 (2017)).

Consider a case where a farmer was suspected to have had marijuana plants on his property. Any reasonable officer would know that a warrant authorizing a search for "property that was stolen, embezzled, or otherwise illegal; or was designed, intended, or had been used to commit a criminal offense; or would be material evidence in a criminal prosecution in Colorado or any other state" was overbroad because it "authorized the seizure of all possible evidence of any crime in any jurisdiction," and "allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the fourth amendment proscribes." Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009). Obviously this is an extreme case scenario allowing for only one answer, whereas in many cases "[r]easonable minds . . . may differ on the question whether a particular affidavit establishes probable cause[.]" United States v. Leon, 468 U.S. 897, 914 (1984). For this reason, the Supreme Court has "expressed a strong preference for warrants," and declared that "in a doubtful or marginal case a search under a warrant

may be sustainable where without one it would fail."  Id.

Here, of course, a search warrant was issued by a judicial commissioner who has not been shown to have been biased, and "an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the warrant is technically sufficient." Id. at 921.  Indeed, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." Messerschmidt v. Millender, 132 S.Ct. 1235, 1245 (2012).  After all, "[s]earch and arrest warrants, typically and in this case, say to the police 'you are commanded,' not 'you may,' search or arrest." Armstrong v. Asselin, 734 F.3d 984, 993 (9th Cir. 2013).

Nevertheless, and as the Supreme Court reiterated in Messerschmidt, "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." Messerschmidt, 565 U.S. at 547.  Rather, the Supreme Court has "recognized an exception allowing suit when 'it is obvious that no reasonably competent officer would have concluded that a warrant should issue." Id. (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  "The 'shield of immunity' otherwise conferred by the warrant will be lost, for example, where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[.]'" Id. (quoting Leon, 468 U.S. at 923).

Plaintiff argues that reliance on the warrant was unreasonable for a myriad of reasons.  For example, he argues that there was no "extensive investigation," pointing primarily to SA Howell's late entry into the investigation, his failure to "discover[] or review[] Brian McGhee's Final Investigative Report in which he recommends the department close the case on Plaintiff's delinquent

12

bond taxes," and his failure "to discover that Plaintiff had a prior agreement with Brian McGhee regarding his bond tax payments for the second quarter of 2018." (Doc. No. 89 at 9). Plaintiff has provided no documentary evidence to support his supposed agreement with McGhee, or anything to suggest that SA Howell or the others were aware of any such agreement. The "case" McGhee recommended closing had to do with the payment of bond taxes for the period January 2017 through March 2018, not the second quarter of 2018. In fact, SA Howell candidly disclosed to the judicial commissioner that Big Jim's bond had paid the "outstanding bond tax owed" for the last two quarters of 2017 and the first quarter if 2018 (albeit late and without penalties and interest), but it had not paid the bond tax for the second quarter of 2018. Plaintiff does not dispute these facts.

Nor does he dispute that SA Howell had assistance from others in drafting the search warrant application. "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Dorsey v. Barber, 517 F.3d 389, 400 (6th Cir. 2008) (quoting Humphrey v. Mabry, 482 F.3d 840, 847 (6th Cir. 2007)). Plaintiff's contention that "the drafting of the search warrant and accompanying affidavit was a collaborative process involving Assistant District Attorney Worley, Assistant District Attorney Hatch, Investigator Slayton, Special Agent Williams, and Special Agent Howell" (Doc. No. 89 at 10) implies that all of them were incompetent or knowingly violated the law, and this also goes for Judicial Commissioner Blevins. See, Messerschmidt, 565 U.S. at 535 (observing that if police officers who sought and obtained a search warrant were incompetent, then "their supervisor, the deputy district attorney, and the magistrate were as well" because all approved the application for a warrant).

"Given the 'sound presumption that the magistrate is more qualified than the police officer to make a probable cause determination," the Supreme Court in Messerschmidt stated that "the

threshold for establishing [the shield of immunity] exception is a high one, [as] it should be," and that "[t]he occasions on which this standard will be met may be rare." Id. at 556. Even considering the other arguments he raises, Plaintiff has not shown this to be the rare case.

Plaintiff argues that Defendants were plainly incompetent or knowingly violated the law because "[t]he entire purpose for the collaborative investigation into Jim Howe was to gather evidence regarding 'sex for bonds' allegations," (Doc. No. 86 at 7), and they "knowingly omitted material facts from the search warrant to hide their lack of sufficient probable cause to support the search of Plaintiff's business." (Doc. No. 89 at 11). He insists that "[i]f these material facts had not been omitted, the search warrant may not have been issued by the magistrate." (Id.). The problem with this argument is that the "sex for bonds" allegations could not have been lost on Judicial Commissioner Blevins. After all, he was informed through the search warrant application that Ms. Russell had claimed that Plaintiff agreed to post bond in exchange for oral sex, and that Ms. Bilbrey claimed that she agreed to provide Plaintiff with Roxicodone tablets and methamphetamine in exchange for a bond. Judicial Commissioner Blevins was also provided with Defendants' theory that these exchanges tended to suggest that Plaintiff was not collecting the tax from his clients as required by state law.

Plaintiff also claims that Defendants did not even need a search warrant to determine whether Big Jim's Bonding was properly paying the bond tax. Instead, they could have simply accessed county arrest records and the TDOR database and compared the two. However, police officers retain discretion in "the performance of their official duties 'as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" Tapp v. Banks, 1 Fed. App'x 344, 349 (6th Cir. 2001) (quoting Anderson v. Creighton, 483 U.S. 635, 638 (1987)).

14

Cross-referencing the public records would not show whether Big Jim's Bonds collected the bond tax from his clients, as Defendants could reasonably read Tenn. Code Ann. § 67-4-803 to require. The allegations made by Ms. Russell and Ms. Bilbrey suggests that he did not, at least in their cases.

Plaintiff further claims that his Fourth Amendment rights were violated as a result of the execution of the search warrant. He complains about (1) being required to give officers his cell phone and its pass-code; (2) that he and Attorney Gardner were ordered to wait outside while the search was conducted; and (3) that both he and Gardner were allegedly threatened with arrest for obstruction if they did not comply with the command to turn over Plaintiff's cell phone or exit the building.

To be sure, "having a knowledgeable person present at the execution of a search warrant, which contains multiple items, for immediate confirmatory viewing of seized property is [a] demonstration of police efficiency, exactitude and protection . . . against an erroneous confiscation of objects which may appear similar to those listed on the warrant." People v. Boyd, 474 N.Y.S.2d 661, 665 (Sup. Ct. 1984). And, "it might be reasonable for police officers to themselves videotape home entries as part of a 'quality control' effort to ensure that the rights of homeowners are being respected, or even to preserve evidence." Wilson v. Layne, 526 U.S. 603, 613, 119 S. Ct. 1692, 1699, 143 L. Ed. 2d 818 (1999). But, Plaintiff cites no authority for the proposition that an individual has an absolute and unfettered Fourth Amendment right to remain on the premises for the duration of a search. Perhaps this is because the contention is usually the opposite, *i.e.*, the defendant should not be held while the search is conducted.

Such was the case in Michigan v. Summers, 452 U.S. 692, 705 (1981) where the Supreme Court held that "a warrant to search for contraband founded on probable cause implicitly carries with

15

it the limited authority to detain the occupants of the premises while a proper search is conducted." The Supreme Court also observed that "[t]he risk of harm to both the police and occupants is minimized if the officers routinely exercise unquestioned command of the situation." Id. at 702-3. Indeed, "[i]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant – subject of course to the general Fourth Amendment protection 'against unreasonable searches and seizures.'" Dalia v. United States, 441 U.S. 238, 257 (1979).

In Streater v. Cox, 336 F. App'x 470, 475 (6th Cir. 2009), "[p]laintiffs claimed that the six-hour removal from their offices while [a] search warrant was being executed violated their Fourth Amendment rights." Based upon Summers, the district court rejected that argument on the grounds that plaintiff's were "not 'seized' in any way," but "were, in fact, allowed to leave the work premises while a search was conducted pursuant to a valid search warrant." Streater v. Cox, No. 07-11163, 2008 WL 564884, at *2 (E.D. Mich. Feb. 28, 2008). This conclusion was affirmed on appeal because Plaintiff's claim did not "implicat[e] the Fourth Amendment." Streater, 336 F. App'x at 475.

Likewise, the Court finds no Fourth Amendment violation here. Plaintiff admits that he was allowed to remain inside his business for a portion of the search, during which time he opened the safe and answered some questions. Gardner stated that she was in the office for "an hour probably." (Doc. No. 77-4, Garner Depo. at 36). Gardner also conceded that she had "words" with SA Williams on more than one occasion before being instructed or ordered to leave the building. (Id. at 24).

As for the cell phone and the alleged threat to charge Plaintiff and/or Gardner with obstruction, it is true that the search warrant did not specifically direct that any cell phones should

16

be seized.[4]  However, "officers do not necessarily exceed the scope of a search warrant by seizing items that are not specifically mentioned in the warrant, so long as those items may contain things that are."  United States v. Oliver, No. CR 15-164 (DSD/BRT), 2015 WL 13731345, at *12 (D. Minn. Oct. 13, 2015) (citing United States v. Gamboa, 439 F.3d 796 (8th Cir. 2006)).  Such was the case in Gamboa where officers obtained a warrant to search a particular location for "firearms, items related to the possession of firearms, indicia of occupancy, records of the use or purchase of controlled substances, and computer hardware, software, and accessories."  Id. at 805.  Officers also seized several cell phones during the search which were not mentioned in the warrant, but the Eighth Circuit held that the seizure did not exceed the scope of the warrant because "cell phones may well contain 'records of the use and purchase of controlled substances.'"  Id. at 807.  Likewise, in United States v. Aguirre, 664 F.3d 606 (5th Cir. 2011), the Fifth Circuit found that officers did not err in seizing a cell phone even though it was not listed because the warrant authorized the seizure of records of drug sales and trafficking, correspondence, address books, and telephone directories.  The Fifth Circuit reasoned that a cell phone can be used as a mode of both spoken and written communication and conceivably contain text messages and call logs, which would serve as the equivalent of records and documentation of sales that were authorized by the warrant.

Similarly here, the warrant allowed the seizure of "any electronic storage media . . . in any form that may document the number of bonds written, [and] the amount of the bond tax written by the business," as well as "records kept in the due course of business" that could show bail bond tax

---

[4]  Although it has no bearing the propriety of the search at issue, the Court notes that, on September 11, 2018, at the request of SA Howell, Judicial Commissioner Blevins issued search warrants for the LG smart-phone and the Samsung Galaxy S8 that were seized on August 29, 2018.  (Doc. Nos. 97-2; 97-3).  It is, however, in keeping with the Supreme Court's requirement in Riley v. California, 573 U.S. 373 (2014) that data from a seized cellphone not be accessed without a warrant.

violations. (Doc. No. 1-1 at 2).  This could include cell phones, or at least a reasonable officer could so assume.[5]

Finally, Plaintiff argues that "the search warrant allowed the Defendants to engage in a general search that greatly exceed [sic] the scope of the violations being pursued and, thereby, violated the particularity requirement of the Fourth Amendment." (Doc. No. 89 at 16).  Plaintiff cites several cases to support that conclusion.

For example, he claims that the "the Eighth Circuit reached a similar conclusion" in In re Grand Jury Proceedings, 716 F.2d 493 (1983), but apart from that case also involving a bonding company, there is little similarity to the facts here.  There, the warrant "did not even refer to the type of criminal offense" under investigation, contained no limitation on the type of transaction at issue, and covered a period of seven years. Id. at 498.  Instead, agents were authorized to seize all bail bond records for the seven year period, even though defendant was being investigated for defrauding "two surety companies he represented in several transactions."  Id. at 498-99.

Plaintiff also cites several cases, such as United States v. Offices, 708 F.2d 1371 (9th Cir. 1983) and United States v. Roche, 614 F.2d 6 (1st Cir. 1980), for the proposition that "a broad search is only permitted where there is probable cause to believe that a business is permeated with fraud." (Doc. No. 90 at 16).  The concern in those case, however, was with the issuance of general warrants

---

[5]Nor, under the particular facts of this case, does the Court see a Fourth Amendment violation in requesting the pass code for a phone that was seized.  See, United States v. Boker No. 3:16-CR-00092-MOC, 2017 WL 3037395, at *2 (W.D.N.C. July 18, 2017) (observing that "use of a key (rather than breaking the door down during a dynamic entry) provides indicia that agents executing the process of this court implemented procedures designed to deescalate matters and minimize damage to private property"); People v. Spicer, 125 N.E.3d 1286, 1290 (Ill. App. 2019) (collecting conflicting authority on whether requiring defendant to provide a pass code to a cellphone is testimonial for purpose of the Fifth Amendment).

without the requisite probable clause. As the Sixth Circuit has explained:

> Although general warrants are prohibited, "where there is probable cause to find that there exists a pervasive scheme to defraud, all the business records of an enterprise may be seized, and consequently a description merely of records of that business will suffice" to satisfy the particularity requirement. 2 W. LaFave, Search and Seizure § 4.6(d) (5th ed. 2018) (quoting United States v. Brien, 617 F.2d 299, 309 (1st Cir. 1980)) (footnotes omitted). In other words, if an organization or business is permeated with fraud, then there is probable cause to believe that all its records are instrumentalities or evidence of a crime. In those circumstances, a warrant authorizing a search of all records is not a general warrant, but rather a warrant describing exactly the items officers have probable cause to search or seize.

United States v. Chaney, 921 F.3d 572, 582 (6th Cir. 2019), and cert. denied, 140 S. Ct. 301, 205 L. Ed. 2d 156 (2019). In contrast, "a warrant that constrains a search to evidence of a specific crime satisfies the particularity requirement." United States v. Castro, 881 F.3d 961, 965 (6th Cir. 2018) (citing United States v. Carter, 792 F. App'x 366, 369 (6th Cir. 2019)). Such was the case here because the search warrant contained directions sufficient "to guide and control the agent's judgment in selecting what to take." Chaney, 951 F.3d at 582.

It must be "[r]emember[ed] that qualified immunity (as we've been reminded again and again) is an 'exacting standard' that gives officers lots of leeway, requiring their conduct to violate clearly established law to defeat the defense." Rudlaff v. Gillispie, 791 F.3d 638, 643 (6th Cir. 2015) (citation omitted). Although there is a growing list of "obvious constitutional violations" by the Supreme Court, see e.g. Taylor v. Riojas, __ U.S. ___, (2020) (inmate in a feces covered cell); McCoy v. Alamu, __ U.S. __, (2020) (single use of pepper spray) sufficient to deny application of qualified immunity, generally. "Existing caselaw, in other words, must put the precise question 'beyond debate.'" Id. (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 131 S.Ct. 2074, 2083, 179 L.Ed.2d 1149 (2011). "Specificity is especially important in the Fourth Amendment context, where the

[Supreme] Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine' . . . will apply to the factual situation the officer confronts." Mullenix v. Luna, 577 U.S. 7, 12 (2015) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)).

Could officers have investigated Big Jim Bonding more before seeking a search warrant? Maybe.  Could the warrant application have included more information or allegations.  Likely. Could the warrant that was issued be more focused or better written. Certainly.  Would the search warrant fail on a motion to suppress? Perhaps.  But none of these are the relevant question.  Rather, the proper question is whether Plaintiff has pointed to clearly established law that would lead a reasonable officer to conclude that seeking and serving the search warrant on Big Jim's Bonding on August 29, 2018 violated the constitution.  Because Plaintiff has not made that showing, summary judgment is appropriate on his Fourth Amendment claim as to all Defendants.

### 2. **Fourteenth Amendment**

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has both a procedural and substantive component, either of which can form the basis for a suit under section 1983.  Zinermon v. Burch, 494 U.S. 113, 124 (1990).

### A. *Procedural Due Process*

 "In order to establish a procedural due process claim, a plaintiff must show that (1) he had a life, liberty, or property interest protected by the Due Process Clause; (2) he was deprived of this protected interest; and (3) the state did not afford him adequate procedural rights prior to depriving him of the property interest." Women's Med. Prof'l Corp. v. Baird, 438 F.3d 595, 611 (6th Cir. 2006) (citing Hahn v. Star Bank, 190 F.3d 708, 716 (6th Cir. 1999)).  "If satisfactory state procedures are

20

provided in a procedural due process case, then no constitutional deprivation has occurred despite the injury." Jefferson v. Jefferson Cty. Pub. Sch. Sys., 360 F.3d 583, 587–88 (6th Cir. 2004) (citing Hudson v. Palmer, 468 U.S. 517, 533 (1984)).

Plaintiff claims that Defendants deprived him "of a protected property interest through unauthorized actions and the post-deprivation procedures are inadequate to compensate for the resulting loss." (Doc. No. 89 at 19). He insists that surety money in the amount of $7,950 was taken during the search, and that at least two client files and evidence bags 3, 4, 7, 8, 11, 17, and 18 were not returned.

Plaintiff's contention that his property was taken as a result of "unauthorized action" is incorrect given this Court's previous discussion relating to the warrant. Regardless, "'[i]n section 1983 damage suits claiming the deprivation of a property interest without procedural due process of law, the plaintiff must plead and prove that state remedies for redressing the wrong are inadequate.'" Pursley v. Orzazio, No. 19-5050, 2019 WL 7592351, at *2 (6th Cir. Aug. 16, 2019) (quoting Vicory v. Walton, 721 F.2d 1062, 1066 (6th Cir. 1983)). Plaintiff has not done so. Quite the contrary, the Amended Complaint contained a claim for conversion and this can be an adequate state remedy. Schulz v. Gendregske, 544 Fed. App'x 620, 626 (6th Cir. 2013); Davis v. Clinton, 74 F. App'x 452, 455 (6th Cir. 2003). Moreover, the Tennessee Rules of Criminal Procedure specifically provide that "[i]f property was unlawfully seized" pursuant to the execution of a search warrant, "the aggrieved person may move for the return of the property." Tenn. R. Crim. P. 41(g). Plaintiff has not shown that this remedy is inadequate.

Accordingly, summary judgment will be granted on Plaintiff's Fourteenth Amendment procedural due process Claim.

21

**B. Substantive Due Process**

Summary judgment will also be granted on Plaintiff's substantive due process claim. "Substantive due process 'prevents the government from engaging in conduct that shocks the conscience' ... or interferes with rights implicit in the concept of ordered liberty[.]'" <u>Prater v. City of Burnside</u>, 289 F.3d 417, 431 (6th Cir. 2002) (quoting <u>United States v. Salerno</u>, 481 U.S. 739, 746 (1987)).

Plaintiff argues that his substantive due process rights were violated because Defendants sought and executed the warrant "with full knowledge and understanding that the search warrant omitted material facts and its scope was not supported by probable cause." (Doc. No. 89 at 23). The Court has already found otherwise. Moreover, even without that finding, Defendants' actions, blessed by a judicial commissioner, hardly shocks the conscience.

"As it is traditionally understood, conduct shocks the conscience if it 'violates the 'decencies of civilized conduct,' and includes actions 'so brutal and offensive' so as to offend 'fair play and decency.'" <u>Larson v. City of Algood</u>, 390 F. Supp. 3d 874, 890 (M.D. Tenn. 2019) (quoting, <u>Cnty. of Sacramento v. Lewis</u>, 523 U.S. 833, 846–47 (1998). "These are subjective standards, to be sure, but they make clear that the 'shocks the conscience' standard is not a font of tort law, but is instead a way to conceptualize the sort of egregious behavior that rises to the level of a substantive due process violation." <u>Guertin v. State</u>, 912 F.3d 907, 923 (6th Cir. 2019) (quoting Range v. Douglas, 763 F.3d 573, 589–90 (6th Cir. 2014)). "Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees." <u>Id.</u>

22

### 3. **Civil Conspiracy**

"A civil conspiracy is an agreement between two or more persons to injure another by unlawful action." Hooks v. Hooks, 771 F.2d 935, 943–44 (6th Cir. 1985). To prevail on this claim, Plaintiff must show "that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy." Heyne v. Metro. Nashville Pub. Sch., 655 F.3d 556, 563 (6th Cir. 2011) (citation omitted). Further, "[a] claim for civil conspiracy under § 1983 exists only where the plaintiff has established a separate and actionable constitutional injury." Rapp v. Dutcher, 557 F. App'x 444, 450 (6th Cir. 2014) Bauss v. Plymouth Twp., 233 F. App'x. 490, 500 (6th Cir.2007)); see also Wiley v. Oberlin Police Dep't, 330 F. App'x. 524, 530 (6th Cir.2009) ("[Plaintiff] cannot succeed on a conspiracy claim because there was no underlying constitutional violation that injured her.").

Because Plaintiff's Fourth and Fourteenth Amendment claims fail, summary judgment will be granted on his civil conspiracy claim.

## B. State Law Claim

Plaintiff's sole remaining state law claim is brought under Tenn. Code Ann. § 8-8-302 against Cumberland County. That statute provides:

> Anyone incurring any wrong, injury, loss, damage or expense resulting from any act or failure to act on the part of any deputy appointed by the sheriff may bring suit against the county in which the sheriff serves; provided, that the deputy is, at the time of such occurrence, acting by virtue of or under color of the office.

Tenn. Code Ann. § 8-8-302.

By the very terms of the statute, Plaintiff cannot recover against Cumberland County because he dismissed his other state law claims, and he has not shown that he incurred "any wrong, injury,

loss, damage, or expense" as a result of the Cumberland County Investigator's actions or inactions under federal law. The statute does not reach negligent acts or omissions, only intentional acts of wrongdoing. <u>Margeson v. White Cty.</u>, No. 2:12-00052, 2013 WL 6712843, at *11 (M.D. Tenn. Dec. 18, 2013); <u>Constantine v. Gadeken</u>, No. 4:12-CV-72, 2013 WL 12099963, at *2 (E.D. Tenn. Aug. 2, 2013); <u>Swanson v. Knox Cty.</u>, No. E200700871COAR3CV, 2007 WL 4117259, at *5 (Tenn. Ct. App. Nov. 20, 2007). Accordingly, summary judgment is warranted on this claim as well.

### III. <u>MOTION FOR LEAVE TO FILE SUR-RESPONSE</u>

Two weeks after the motions for summary judgment were fully briefed, and while this decision was in draft form, Plaintiff filed a motion to file a sur-response to the reply filed by SAs Williams and Howell. In it, he essentially makes five points, none or which changes this Court's conclusion.

First, Plaintiff challenges Defendants' assertion that the TDOR has no documented proof that Plaintiff had an agreement with SA McGhee extending the time for payment of the second quarter taxes for 2018. Plaintiff argues that "Defendants attempt to use the lack of documentary proof to divert scrutiny away from the Defendants' failure to investigate," and that "the cited responses also admit to the likelihood that an agreement existed. (Doc. No. 97 at 2)." (Doc. No. 106-1 at 2). Turning to the latter point first, it is not this Court's obligation to plow through the "cited responses" (which consists of citations to deposition testimony, interrogatory responses, the search warrant, and the application for the search warrant) in order to determine whether it was "likely" an agreement existed. Rather, it was Plaintiff's burden to prove that one existed, or at least show that there was a genuine issue of fact on this matter requiring a trial. As to the former point, this Court has already acknowledged that the investigation could have been more thorough.

24

Second, Plaintiff argues that a review of TDOR's records and the County Court Clerk's Office records would "show the number of bail bonds written by Plaintiff and, therefore, how much bond taxes he owed." (Doc. No. 106-1 at 3). Again, that may well be true, but those records would not show that Plaintiff collected actual money from his clients for the bond taxes.

Third, Plaintiff (1) argues that "Defendants struggle to support a blanket search and seizure of Plaintiff's computer hard drive, cellular phone device, and other electronic storage media with boiler-plate language that businesses store their records electronically"; (2) asserts he has "already shown that the search warrant was overbroad because it was not appropriately limited in scope and resulted in the search and seizure of unrelated records, documents, and other information," and (3) cites three appellate and one district court case to support those propositions. Plaintiff's choice of cases is curious at best.

In each of the three appellate court cases, the court found the warrant was over-broad, but also found that defendants were entitled to rely on the Leon good faith exception: (1) in United States v. Otero, 563 F.3d 1127, 1135 (2009) partly because the postal investigator who was investigating the case "did not stop at her own understanding of the warrant, but sought the assistance of the Assistant United States Attorney, who ensured her that it satisfied the legal requirements"; in United States v. Riccardi, 405 F.3d 852, 862 (10th Cir. 2005) because the detective who found a thumbnail containing child pornography questioned whether a more specific warrant was needed and "consulted with a prosecutor who gave assurances that an additional warrant was not required"; and (3) in United States v. Richards, 659 F.3d 527, 540 (6th Cir. 2011) because (a) "the warrant was not 'so facially deficient' in describing the items to be seized that the agents could not reasonably presume it to be valid," and, (b) even if it was, "Leon made clear that only in exceptional

25

circumstances is law enforcement to disregard a magistrate judge's authorization. The district court case – United States v. Robert, No. 3:08-CR-175, 2010 WL 234719, at *15 (E.D. Tenn. Jan. 14, 2010) – dealt with the issue of whether a "preponderance of the evidence" test or a "clear and convincing evidence" test should be used under Bumper v. North Carolina, 391 U.S. 543 (1968) in determining whether a defendant acquiesced to a search. Here, of course, the search was based on a warrant that was based upon a "collaborative effort." Not only did SA Howell consult with his colleagues and ADAs, he also received approval from the judicial commissioner.

Fourth, Plaintiff challenges Defendants' assertion that "'[t]he affidavit specifically stated that a former employee of Big Jim's Bonding advised Special Agent Williams that when she worked for Big Jim's Bonding, she took payments from clients and was responsible for entering the information in a spreadsheet stored on the office computers," when, in fact, the affidavit actually said, "Special Agent Elizabeth Williams . . . spoke with Jacklyn Chelsea Crabtree . . . [who] told her that she is a former employee with Big Jim's Bonding and worked there during a six (6) week period of time beginning in mid-April of 2017." (Id. at 5). Plaintiff argues that "Defendants attempt to use these statements to vindicate a violation of the particularity requirement of the Fourth Amendment." (id.), but this Court already addressed the particularity requirement and did not rely upon what Ms. Crabtree said, or may have said.

Fifth, Plaintiff argues that Defendants are incorrect insofar as they argue that the subsequently executed search warrant for the cellphones "exonerated the original search warrant." (Id. at 6). Plaintiff is correct, but this point has already been made by the Court.

Because the Court has considered Plaintiff's sur-response, his Motion for Leave to File Sur-response will be denied as moot.

# IV.  **MOTION TO SET ASIDE PROTECTIVE ORDER**

Finally, Plaintiff has filed a motion to set aside the agreed protective order in this case that was based upon Tenn. Code. Ann. §§ 10-7-504(a)(2)(a) and 67-1-1702, arguing that good cause no longer exists for the protective order.  He notes that Tenn. Code Ann. § 10-7-014(a)(2)(a) specifically prohibits the TBI but not the TDOR from disclosing investigative files, and Tenn. Code Ann. § 67-1-1702 prohibits disclosure of taxpayer records.  Plaintiff submits that since he is the taxpayer, the protection is not necessary, and that "[c]ontinuing to suppress the Plaintiff's use of the government's own video interviews with adult women who either dispute the Defendants' allegations or accuse the Plaintiff of crimes is a dark inverse of the principles of a free, fair, and open justice system enshrined in binding precedent."  (Doc. No. 104 at 2).  After all, "[i]f the government agent defendants had enough evidence to charge Plaintiff Howe with the sex-crimes they accused him of to several of his clients and other community members, undoubtedly, they would have done so in a public indictment."  (Id. at 5).

Telling, Plaintiff states that he "has now reviewed the documents subject to the blanket protective order in this case," but he points to nothing in those documents that exonerates him. Nevertheless, he seeks to eviscerate the entirety of the protective order, even though, in seeking approval of the order, the parties agreed that the relevant records "are voluminous and contain significant amount of private/confidential information about individuals who are not parties to the subject litigation."  (Doc. No. 53 at 3).

"It should be no surprise that, there having been good cause to enter the protective order in the first place, there must be good cause shown before it can be vacated." Murata Mfg. Co. v. Bel Fuse, Inc., 234 F.R.D. 175, 179 (N.D. Ill. 2006) (collecting cases).  "And it is the burden of the party

seeking to vacate or modify the protective order . . . to demonstrate good cause." Id.

Leaving aside that Plaintiff's denial of wrongdoing and his assertion Defendants violated his constitutional rights are abundantly clear based upon the numerous filings in this case, he has not shown good cause to vacate the entire protective order that includes confidential and private information. As such, his motion will be denied.

## V.  **CONCLUSION**

On the basis of the foregoing, Defendants' Motions for Summary Judgment will be granted; Plaintiff's Motion for Leave to File Sur-Response will be denied as moot; and Plaintiff's Motion to Set Aside Protective Order will be denied.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE